IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

JILLIAN WATKINS,

                Plaintiff,

v.                                   CIVIL ACTION NO.  3:22-0109

LINCARE, INC.,

                Defendant

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Lincare Inc.'s Motion for Summary Judgment. ECF No. 188. Upon review of the parties' memoranda and evidence, and for the reasons that follow, Defendant's motion is **DENIED in part and GRANTED in part**.

## I.  BACKGROUND

**A.  The Parties**

Defendant Lincare provides in-home respiratory care durable medical equipment ("DME"), including CPAP machines and ventilators. Mem. of Law in Supp. of Lincare Inc.'s Mot. for Summ. J. (hereinafter "Def.'s Mem. of Law"), ECF No. 189. Lincare is "only paid for the equipment they provide," and the cost of all other services, including delivery costs, and payment of services, support and clinical staff is "built in" to the monthly prices of the equipment. Reynolds

Dep. 97:7–17.[1] Federal programs, including Medicare and Medicaid, pay for most of these monthly equipment fees. *See id.* at 19:8–14.

In 2018, Lincare entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the United States Department of Health and Human Services ("OIG") relating to "compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs[.]" CIA 1, ECF No. 193-8; [2] Pedersen Dep. 80:1–24.[3] This CIA was operative at all relevant times herein. *See* Moreau 30(b)(6) Dep. 96:3–5.

Under the CIA, Lincare was required to notify the OIG of any "Reportable Event" within 30 days after determining a Reportable Event exists. CIA 11–12. A Reportable Event includes, in pertinent part, any "substantial Overpayment" and any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." *Id.*

An "Overpayment" is defined as "any funds that Lincare receives or retains under any Federal health care program to which Lincare, after applicable reconciliation, is not entitled under such Federal health care program." *Id.* at 11. For example, if Lincare were to bill Medicare for keeping a piece of DME in the home of a patient where it is not used and where services are not provided, an Overpayment would result.

---

[1] Inasmuch as neither side has provided the full transcripts of the relevant depositions cited herein, deposition testimony will be cited to generally, rather than by reference to the respective ECF documents.

[2] According to the Preamble of the CIA, Lincare contemporaneously entered into a settlement agreement with the United States relating to Medicare billing. CIA 1.

[3] Jenna Petersen is Lincare's Chief Compliance Officer.

Plaintiff Jillian Watkins was hired as the "center manager" for Lincare's Huntington, West Virginia location in July of 2017 when Lincare purchased another durable equipment and respiratory service provider, AllMed. Watkins Dep. 19:4–13.[4]

Center managers for Lincare are "responsible for operation of a Lincare center with sales, and supervision of the center employees." Job Description, ECF No. 193-4. Watkins' listed responsibilities included, *inter alia*, making sales calls, controlling inventory, ensuring the quality and safe delivery of medical equipment, and supervising other employees. *Id.* Center managers may also "be required to perform equipment set-ups in the customer's home[.]" *Id.* Lincare does not require its center managers to be licensed respiratory therapists ("RT"), and Watkins is not a licensed RT and has no medical training. *See* Watkins Dep. 11:18–24.

At some point early on in her employment with Lincare, Watkins was given access to a software program called "Care Orchestrator." Moreau 30(b)(6) Dep. 12:16–18. Care Orchestrator is a program that Lincare used "to download or upload information to and from CPAP devices." *Id.* at 12:13–15. Although Lincare had the ability to grant its employees "different levels of access" to the program, Watkins was given a high level of access that allowed her not only to review and enter patient information, but also to alter settings for patients' CPAP devices. *See id.* at 12:21–14:25; Watkins Dep. 222:3–17.[5]

_____

[4] Prior to her employment with Lincare, Watkins was a general manager at AllMed. Watkins Dep. 19:4–8.

[5] Lincare's representative testified that Care Orchestrator access is assigned based on job title. Moreau 30(b)(6) Dep. 18:18–22. During her individual deposition, Lincare's National Healthcare Services Manager Sandra Moreau testified that because some Center Managers for Lincare are RTs, all Center Managers must be given the access required to perform RT duties. *See* Moreau Dep. 65:7–23. Despite this testimony, Lincare has failed to provide evidence that it was required to assign access based on job title, rather than based on individual qualifications and needs.

Not only was Watkins given access that allowed her to alter settings, she also testified that she was specifically trained on how do so. *See* Watkins Dep. 222:8–12. Although this training was likely provided by Lincare through a third party, Lincare admits that it "does not provide follow-up training on Care Orchestrator," and Lincare representatives could not testify that Watkins was ever informed she was not permitted to input pressure settings on CPAP devices. *See* Moreau 30(b)(6) Dep. 23:21–25, 24:11–16, 30:21–32:20.

**B. Watkins Reports Employee Misconduct**

Around March 2020, Watkins conducted an informal "audit" and discovered that RT Andrea McClung had been falsely documenting that she was seeing patients for which Lincare was billing.[6] Watkins Dep. 79:5– 80:23, 86–91:11, Watkins Aff. ¶ 28, ECF No. 193-11. Watkins reported the issue to Sherry Robinson, Lincare's Regional Healthcare Manager. *See* Watkins Dep. 100:14–101:19. Robinson told Watkins to take her concerns to HR. *See id.* at 101:18–19; Robinson Dep. 132:1–9. Watkins did, and HR provided her with a "written warning" to give to McClung on April 9, 2020. *See* Watkins Dep. 101:20–21; McClung Written Warning, ECF No. 193-12.

A few months later, around June 2020, Watkins conducted a second audit of the center's files and discovered that McClung was continuing to engage in the same conduct. Watkins Dep. 106:9–24; 115–18; Watkins Aff. ¶ 29. Watkins reported her concerns to Robinson, who once again directed her to HR. Watkins Aff. ¶ 29.[7]

After her second audit, Watkins requested that McClung be terminated. She testified that McClung's actions were a "huge compliance issue" and that McClung was "putting patients' safety

---

[6] The effect of this false documentation is that McClung was not ensuring that patients were using their DME and that Lincare was likely billing government programs for DME were not being used.

[7] Despite her supervisory role over McClung, at no time did Robinson make a report, to HR or otherwise, flagging potential Overbilling caused by McClung.

at risk." Watkins Dep. 121:13–18. Nevertheless, Lincare's HR department told her that McClung was in two protected classes and suggested that termination could get the company in "hot water with the EEOC." June 2020 Emails, ECF No. 193-16. Instead of approving the termination of McClung, Watkins was urged to issue her a final written warning. That final written warning was prepared by HR and given to McClung by Watkins on June 19, 2020. McClung Final Written Warning, ECF No. 193-17.

After the final written warning, McClung initially did "better." Watkins 144:24–145:6.[8] But that fall, Watkins conducted a third audit of the charts and realized McClung had reverted to the same behavior. *Id.* at 145:4–11; 146:4–147:2. Watkins yet again reported these continued problems to Robinson in early November 2020. *Id.* at 151:22–152:21. At this point, Lincare argues it "initiated the termination process, but did not immediately carry out McClung's termination due to an ongoing internal investigation into ventilator usage and billing at the Huntington Center." Def.'s Mem. of Law 7 (citing McClung's Electronic File, ECF No. 188-4).

At bottom, it is undisputed that despite multiple accusations that McClung was engaging in unlawful and improper conduct, McClung was not terminated by Lincare. Instead, on November 17, 2020, McClung resigned from her position and indicated that she would be starting new employment elsewhere. McClung Resignation Letter, ECF No. 193-22.

## C. Lincare's Termination of Watkins

Less than two months after Watkins's third report, Lincare terminated Watkins. Her termination letter was signed and delivered by Will Reynolds on January 8, 2021. Term. Letter, ECF No. 188-17. The letter states as follows:

---

[8] On July 15, 2020, McClung received a third warning. *See* McClung Documented Verbal Warning, ECF No. 193-18. It does not appear that this warning was related to McClung's alleged fraudulent conduct and is not thoroughly discussed by either party.

It was recently discovered during an internal investigation that you have:

- provided inadequate direction and leadership to your staff, which has led to numerous and serious violations of Lincare's policies and procedures; and
- performed functions outside the professional scope of your position as a Center Manager.

*Id.* These actions were found to be "Major Infractions" supporting immediate discharge. *Id.*

According to Lincare, "the actions that resulted in Ms. Watkins' termination include inadequate leadership over her staff as well as changing pressure on CPAP devices which is beyond her scope" and permitting another "unlicensed person to perform tasks and duties beyond their scope." Moreau 30(b)(6) at 35:21–24, 37:15–21.[9]

Lincare claims Watkins admitted to these infractions in an email dated January 7, 2021—the day before her termination. That email purports to summarize a conversation Watkins had with Moreau and Compliance Investigator Samantha Swafford. *See* Jan. 7, 2021 Email, ECF No. 188-9. Therein, Watkins recalled a situation where a customer service representative by the name of Jenny asked Watkins if Jenny was permitted to release a machine to a customer without a therapist present. *Id.* at 1. Watkins admitted that she "didn't know the answer to that because [the center] ha[d] never been without a therapist[.]" *Id.* Watkins ultimately permitted Jenny to provide the device to the client. *See id.*

Watkins also noted that during her conversation with Moreau and Swafford, she was asked about a "pressure change." She recalled the incident as follows:

> I was asked if a pressure change came in who did it. I said it was given to the therapist to do but on more than one occasion they never followed through and did it and if the pt or doctor called in because it was never done we would go in and find the rx and then go into the system and find the pt in care orchestrator or airview and change the settings to what the script said. A lot of the time the rt that did the

---

[9] Evidence indicates that it was Moreau who recommended Watkins' termination. When asked why she made the recommendation, Moreau testified "[t]here was significant risk to patients, employees, operating beyond her scope untrained, jeopardizing the safety of the patients we service in West Virginia." Moreau 30(b)(6) Dep. 167:3–6.

initial setup never put the pt in so we would have to add them. Again was asked who is we. I said me and jenny and i said i keep saying we because jenny and i are the only 2 that ever get in those systems.

*Id.* Watkins went on to state:

Then asked if we rec'd a pressure change back in April would I have went in the system and changed it myself. I said yes if it was already given to a therapist to do and they didn't do it and the pt or dr called in mad that it hadn't been done then yes I would have. That we did not know that we were not allowed to enter pts in the systems until this issue with the frye exchange. And I stated that I always put a note in lite stating… rec'd rx for whatever change. Completed in whichever system and both pt and dr were notified it was completed.

*Id.* at 2. Lincare presents no evidence contradicting Watkins' assertion that she always documented settings alterations.

## D. Lincare's Internal "Investigations"

In late 2020 and early 2021, Lincare undertook two internal "investigations" it has since dubbed the "clinical investigation" and the "compliance investigation" (also referred to at times as the "ventilator investigation"). *See* Def's Mem. of Law 7–10.

According to Lincare's representatives, the clinical investigation "related to unlicensed practice and direction of staff to perform tasks and duties outside their scope." Moreau Dep. 99:9–12. The origin of the clinical investigation is murky. On one hand, Lincare submits that it was spurred by RT Kayla Moore reporting to Robinson that Watkins had improperly made changes to the pressure settings on a patient's CPAP machine in Care Orchestrator in late December 2020. *See* Def.'s Mem. of Law 8 (citing Moore Dep. 73: 8–12). On the other hand, around the same time Lincare asserts its agents, including RT Moore,[10] received phone calls from individuals at the West Virginia Board of Respiratory Care ("WVBRC") regarding alleged unlicensed practice at the Huntington Lincare location. *See* Moore Dep. 14:2–15:7 (testifying she received a call from a man

---

[10] It is not lost on the Court that Moore was the source of both the alleged patient call and some of the alleged calls from WVBRC.

on behalf of WVBRC in December 2020 regarding this alleged complaint); Aff. of Kayla Moore, ECF No. 193-38 ¶¶ 6–10; Aff. of William Reynolds, ECF No. 193-39 (stating that he received a call from a the WVBRC regarding clinical services at the Huntington Center and that he reported the contact to Lincare's corporate office); Lincare Internal Emails, ECF No. 193-37 (internal emails discussing calls from the WVBRC to Moore and noting that it was inquiring about DME "being set up by non-clinician").

Curiously, the WVBRC maintains that it did not make those calls and that it never opened an investigation into Watkins or the Huntington location regarding unlicensed practice or staffing issues. *See* Massey Dep. 33–35, 61–62, ECF No. 193-41. Lincare posits that the question of whether the investigation existed is immaterial because Lincare "believed" the investigation existed. *See* Def.'s Mem. of Law 18. Yet, what Lincare and its representatives believed is a credibility determination the Court cannot make on the parties' papers alone.

Regardless of its provenance, Lincare claims that Watkins' termination arose solely from the clinical investigation. The compliance investigation, on the other hand, was related to Overbilling under the CIA. Despite Watkins' documented concerns about McClung and her unethical documentation practices, Lincare representatives testified that this investigation did not start until January 2021. *See* Moreau Dep. 91:23–25. In fact, Moreau testified that she could not recall anyone communicating concerns about ventilator non-usage or documentation issues prior to November or December 2020. *Id.* at 98:5–10. This, of course, is at odds with Lincare's representation that McClung was not immediately fired because of an "ongoing internal investigation into ventilator usage and billing at the Huntington Center." Def.'s Mem. of Law 7.

The compliance investigation led to significant liabilities for Lincare. On June 23, 2021, Lincare wrote a letter to the OIG to report that it had committed Overpayments in the amount of

$485,901.70. OIG Letter, ECF No. 188-21. The letter states that Lincare conducted an audit, after a "Regional Healthcare Manager reported to the National Healthcare Services Manager concerning the lack of clinical documentation for non-invasive ventilators at the Lincare location in Huntington, WV." OIG Letter 1.   The Regional Healthcare Manager at issue, of course, is Robinson, the person to whom Watkins reported McClung's inadequate and false documentation.[11]

The letter provides that in order "*[t]o prevent [the] same from recurring, Lincare terminated the Center Manager, who was responsible for oversight of all employees at this location*[.]" OIG Letter 2 (emphasis added). Similarly, Lincare's internal notes regarding the compliance investigation offer that "[t]he Center Manager's lack of oversight permitted these issues to occur*, and she was terminated for such conduct by Human resources*." Compliance Report Log, ECF No. 188-23 (emphasis added). These documents unquestionably assert that Watkins was both responsible for and terminated because of the Overpayments.

Yet, it is undisputed that Watkins had timely notified her superiors of McClung's conduct in March, June, and November 2020. In fact, from the record currently before the Court, it appears that she was the only Lincare employee who reported Overbilling concerns. Moreover, Lincare representatives, including Pederson, the Chief Compliance Officer who signed the OIG Letter, testified that Watkins was not responsible for the Overpayments. *See* Moreau 30(b)(6) Dep. 92:10–13 (testifying that Watkins' termination "had nothing to do with the overpayment"); *Id.* at 95:5–8 (testifying that Lincare does not "blame Ms. Watkins for the events that caused the $485,000

---

[11] This is true, notwithstanding the fact that Robinson testified it was her responsibility to ensure that vent checks were performed in compliance with the law and that the respiratory therapists under her supervision were providing appropriate clinical services. *See* Robinson Dep. 60:18–21; 132:19–33. Robinson was ultimately given a "Final Written Warning" related to the Lincare's Overpayments. *See* Final Written Warning, ECF No. 197-27.

overpayment"); Pedersen Dep. 149:8–9 ("My testimony today is that [Watkins] was not terminated based on the overpayments.").

### E.  Procedural Background and Intervening Events

In response to the foregoing, Watkins filed a single-count Complaint on March 2, 2022, alleging that Defendant Lincare retaliated against her in violation of the West Virginia Patient Safety Act (WVPSA). Compl. ¶¶ 48-53, ECF No. 1. Lincare filed a motion to dismiss the Complaint, which the Court denied in part and granted in part. ECF No. 11. The Court found that though Watkins had sufficiently alleged that she was a health care worker interacting with patients under the WVPSA, the Act does not allow recovery of emotional distress damages. *Id.* at 8.; *see* Mem. Opinion & Order, ECF No. 87 (denying Plaintiff's Motion to Reconsider Order Prohibiting Recovery of Emotional Distress Damages Under the WVPSA).

On April 11, 2023, Watkins moved for leave to file her Amended Complaint. Mot. for Leave, ECF No. 91. Lincare opposed the motion arguing, among other things, that the proposed amendments were futile. *See* Opp. to Pl.'s Mot for Leave, ECF No. 101. The Court granted Watkins' motion for leave on June 23, 2023, and directed the Clerk to file Plaintiff's Amended Complaint. Memorandum Opinion & Order, ECF No. 115.

The now operative Amended Complaint, ECF No. 166, contains three causes of action: (I) unlawful retaliation in violation of the West Virginia Patient Safety Act; (II) retaliatory discharge in violation of a substantial public policy; and (III) "outrage."

Lincare moved for summary judgment on all three counts of Watkins' Amended Complaint on November 20, 2023. Mot. for Summ. J. 1. The parties fully briefed the motion, and the Court held oral argument on the motion on February 6, 2024. ECF No. 204. Normally, the facts of the case would end here. But, on February 16, 2024, nine days after the Court heard oral argument on

Lincare's motion for summary judgment, Lincare filed a Notice of Supplemental Disclosure and Document Production. ECF No. 209. Therein, Lincare disclosed that it was the subject of a False Claims Act *qui tam* suit, captioned *United States ex rel. Gauch v. Lincare*, that was filed on January 29, 2012018, the United States District Court for the Southern District of New York. *Id.* at ¶¶ 8–10. That action was fully resolved via settlement on February 8, 2024, and, per Lincare's Notice, was unsealed by the Southern District of New York on February 14, 2024.

Watkins swiftly filed a motion for leave to file a sur-reply to Lincare's summary judgment, arguing that the newly disclosed *qui tam* and Lincare's settlement thereof support her case. *See* Notice & Mot., ECF No. 211. Lincare opposed the motion, averring that the unsealing of Lincare's settlement with the United States "does not add anything relevant or impact Lincare's pending Motion for Summary Judgment." Resp. in Opp. 2, ECF No. 215. The Court granted Watkins' motion for leave and provided both parties with the opportunity to file supplemental memoranda. *See* Order, ECF No. 218. Those memoranda, Pl.'s Sur-Reply, ECF No. 220, ECF No. 220; Def.'s Resp. to Pl.'s Sur-Reply, ECF No. 221, and their supporting exhibits, show as follows.

Relators filed a *qui tam* complaint against Lincare on January 29, 2018 in the Southern District of New York alleging, *inter alia*, that Lincare knowingly submitted false claims to federal health care programs in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq. See U.S. ex rel. Gauch v. Lincare Holdings, Inc.*, 18-cv-783 (S.D.N.Y), ECF No. 220-1. The United States intervened to prosecute that motion. *See* ECF No. 220-2.

In early February 2024, Lincare entered into a settlement agreement (hereinafter referred to as "Settlement Stipulation") with the OIG. Settlement Stip., ECF No. 220-3. In the Settlement Stipulation, Lincare "admits, acknowledges and accepts responsibility" that between January 1, 2013 and February 29, 2020, it, *inter alia*, "continued to seek monthly payments from Federal

health care programs for NIV rentals in many instances when its staff had not verified that patients were still using their NIVs, or had not maintained documentation showing that the patient continued to us the devices,"[12] and "[i]n some instances, Lincare continued to seek monthly payments from federal health care programs when it was aware that patients were not using the devices." *Id.* at 4–5. As a result, "Lincare received reimbursements from the Federal health care programs for some NIV rental claims that did not comply with all of those programs' billing rules and guidance." *Id.* at 5.

In order to settle the claims set forth in the SDNY *qui tam*, Lincare agreed to pay the Federal Government $24,228,517.96, plus interest. *Id.*[13] Watkins notes that the Settlement Stipulation releases Lincare from civil liability for overbilling for the covered period of January 1, 2013 to February 29, 2020, but it does not release Lincare for any false claims or Overbilling that occurred following the covered period. Accordingly, the Overbilling Watkins reported at the Huntington Center beginning in March 2020, is not covered by the Settlement Stipulation.[14]

---

[12] NIV are "non-invasive ventilators," a type of DME. *See* Settlement Stip. 1.

[13] The Court finds that evidence of the SDNY settlement is not inadmissible under Rule 408. First, Rule 408 does not preclude the admission of settlement agreements for the purpose of showing a defendant's knowledge or intent. *See, e.g.*, *City of Huntington v. AmerisourceBergen Drug Corp.*, No. CV 3:17-01362, 2021 WL 1711381 (S.D.W. Va. Apr. 29, 2021). Second, as Watkins notes, the Settlement Stipulation expressly prohibits Lincare from contradicting or making statements that are inconsistent with the admitted conduct therein. *See* Settlement Stipulation at 11.

[14] The Parties make various arguments about the significance of the covered period ending just days before Watkins made her first report about McClung. Lincare argues that the covered period for the SDNY case ended in February 2020 solely to avoid issues that may have arisen at the beginning of the COVID-19 pandemic. Resp. to Sur-Reply 3. Yet, Lincare has not provided any evidence to support that claim. Additionally, as will be discussed herein, the most important fact is undisputed—by the time Watkins started making her reports, Lincare knew it was the subject of a False Claims Act *qui tam*. *See id.*

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A.  Count I: Retaliation in Violation of the West Virginia Patient Safety Act

The West Virginia Patient Safety Act ("WVPSA") provides, in pertinent part,

> No person may retaliate or discriminate in any manner against any health care worker because the worker, or any person acting on behalf of the worker . . . [m]akes a good faith report, or is about to report, verbally or in writing, to the health care entity or appropriate authority an instance of wrongdoing or waste.

W. Va. Code § 16-39-4(a)(1).

"The legislative purpose of the [WVPSA] is to protect patients by providing protections for those health care workers with whom the patient has the most direct contact." *Camden-Clark Mem'l Hosp. Corp. v. Tuan Nguyen*, 807 S.E.2d 747, 752 (W. Va. 2017) (internal citations omitted).

To establish a *prima facie* case of retaliation, a plaintiff must prove the following: (1) she was a health care worker; (2) who was retaliated against; (3) for making a good-faith report of wrongdoing or waste. *See* W. Va. Code § 16-39-4(a); *Daniel v. Raleigh Gen. Hosp. LLC*, No. 5:17-CV-03986, 2018 WL 3650248, at *9 (S.D.W. Va. Aug. 1, 2018) (applying the *McDonnell Douglas* Title VII framework to a WVPSCA claim).[15] After a plaintiff establishes a *prima facie* case, the defendant has the burden of production to offer some non-retaliatory reason for the adverse employment action. *Id.* Finally, the burden shifts back to the plaintiff, who must demonstrate that the employer's proffered reason was a pretext for the unlawful retaliation. *Id.*

Lincare argues that the WVPSA claim fails for the following three reasons: (1) Watkins cannot state a *prima facie* case of retaliation because her termination was not retaliatory in nature; (2) Lincare has provided non-retaliatory reasons for Watkins' termination; and (3) Watkins has not carried her burden of demonstrating pretext. *See* Def.'s Mem. of Law. The Court is not persuaded by any of these arguments.

*First*, Watkins' burden at the *prima facie* stage is not onerous. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). In fact, "[t]his evidentiary burden is de minimis." *Hawley v. Hospice of Huntington, Inc.*, No. CV 3:19-0759, 2021 WL 517049, at *3 (S.D.W. Va. Feb. 11, 2021) (citing *Nestor v. Bruce Hardwood Floors, L.P.*, 558 S.E.2d 691, 694 (W. Va.

---

[15] West Virginia regularly applies the Title VII framework to state retaliation and discrimination claims. *See Conaway v. E. Assoc. Coal Corp.*, 358 S.E2d 423, 429–30 (W. Va. 1986).

2001)). For purposes of this motion, Lincare does not contest that Watkins is a "health care worker" under the Act. *See* Def.'s Mem. of Law 7 n.50; *see also Watkins v. Lincare Inc.*, No. CV 3:22-0109, 2022 WL 1696595 (S.D.W. Va. May 26, 2022) (denying Lincare's motion to dismiss based on the argument that Watkins cannot be considered a health care worker under the WVPSA). Additionally, Lincare concedes that Watkins made a good-faith report of wrongdoing or waste.[16]

Accordingly, all Watkins must do is make a de minimis showing that she was retaliated against. The WVPSA defines "retaliation" as including any "adverse change in a health care worker's position, location, compensation, benefits, privileges or terms or conditions of employment that occurs as a result of a health care worker engaging in any action protected by this article." W. Va. Code § 16-39-3(4). As noted above, Watkins was terminated from her position with Lincare. Thus, she suffered an adverse change in her position. Moreover, Watkins has offered evidence that shortly after her third report of wrongdoing and/or waste, she became the subject of the company's "clinical investigation" and was then used by Lincare as the scapegoat for the very conduct she reported. Based on these facts, the Court is satisfied Watkins has made a *prima facie* case of retaliation.

---

[16] "Wrongdoing" is defined as "a violation of any law, rule, regulation, or generally recognized professional or clinical standard that relates to care, services, or conditions and which potentially endangers one or more patients or workers or the public." W. Va. Code § 16-39-3. "Waste" means "the conduct, act, or omission by a health care entity that results in substantial abuse, misuse, destruction, or loss of funds, resources, or property belonging to a patient, a health care entity, or any federal or state program." *Id.*

It is fair to say that McClung's alleged conduct, as reported by Watkins, constituted both "waste" and "wrongdoing." The alleged conduct was waste, because it resulted in a substantial abuse of, and loss of funds to, federal programs. The conduct was also wrongdoing, because a healthcare provider's false documentation of patient visits undoubtedly violates many professional standards and potential endangers the patients under the provider's care.

*Second*, while it is true that Lincare has provided a non-retaliatory reason for Watkins' termination—specifically Lincare submits Watkins was fired for changing CPAP settings[17] and her "inadequate leadership"—West Virginia law makes crystal clear that the mere submission of "an arguably legitimate, non-pretextual, and non-retaliatory or discriminatory reason" for an employee's termination does not "entitle" the employer to summary judgment. *Taylor v. W. Va. Dep't of Health & Hum. Res.*, 788 S.E.2d 295, 307 (W. Va. 2016). The employee has the opportunity to show that the proffered reason is pretextual. Watkins has done so here.

"Pretext may be shown through direct or circumstantial evidence of falsity or discrimination." *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 160 (W. Va. 1995) (citing *Burdine*, 450 U.S. at 256 (holding that once the employer meets its burden of production, the employee has "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision")). The West Virginia Supreme Court of Appeals has held "a finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action," and therefore,

> unless the employer comes forward with evidence of a *dispositive*, [legitimate] reason as to which there is no real dispute and which no rational trier of fact could reject, the conflict between the plaintiff's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.

---

[17] The parties dispute the legality of such conduct. *See* Resp. in Opp. 12 n. 91 (arguing that West Virginia law does not prohibit Watkins "transcribing a doctors' [sic] orders into Care Orchestrator"). Ultimately, the Court need not determine whether it was unlawful for Watkins to enter CPAP settings that are consistent with a doctor's orders. Controlling caselaw provides that if this conduct was truly the basis for Lincare's termination of Watkins, its assessment of illegality is sufficient, even if it is incorrect. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). The real question before the Court is whether the reason Lincare provided was pretextual. *See id*. ("[I]t is not [the Court's] province to decide whether the reason was wise, fair, or even correct ultimately, so long as it was truly the reason for the plaintiff's termination.").

*Id.* at 160, 164 n.19 (emphasis in original) (internal quotation marks and citation omitted); *Knotts v. Grafton City Hosp.*, 786 S.E.2d 188, 199 n. 13 (W. Va. 2016).

Lincare's proffered reason for terminating Watkins was that she improperly changed CPAP settings on at least one patient machine and that failed to sufficiently supervise subordinate employees. To that end, Lincare maintains that Watkins "admits" she changed a patient's CPAP settings and that she allowed subordinate employee to inappropriately sign paperwork. These alleged admissions are found in a January 7, 2021 email from Watkins, which purports to recap a conversation she had with Swafford and Moreau the previous day. *See* Jan. 7 2021, Email.

Despite Lincare's strong characterization, the Court finds that the letter neither serves an admission to wrongdoing nor closes the door on Watkins's claims of pretext. Instead, the email establishes the "changes" she made to patient's devices were limited to entering doctor's prescriptions when therapists had failed to do so. *See id.* Additionally, the email makes clear that Watkins had openly engaged in this conduct for some time, which calls into question why it was suddenly a reason for immediate termination.

Importantly, Watkins has produced additional evidence that challenges the truthfulness of Lincare's proffered reasons. That evidence includes the following: (1) Watkins came under Lincare's scrutiny shortly after her third report about McClung;[18] (2) the suspicious nature, or perhaps falsity, of the WVBRC investigation; (3) Lincare was under investigation for submitting false claims to federal program at the time Watkins made her reports; and (4) Lincare put in writing, both internally and to the federal government, that the true reason it fired Watkins was

---

[18] While Lincare makes some hay about the fact that Watkins was not retaliated against after her first two reports, *see* Def.'s Mem. of Law 7, it is not unreasonable to infer that it hoped her reports would cease and that when she made her third report in November it realized she was going to continue raising flags about false claims or Overbilling.

because she was "responsible" for the Overbilling. In fact, Lincare's OIG letter itself creates a reasonable basis to reject Lincare's proffered reasons for terminating Watkins.

Surely, if Watkins' evidence is found to be credible and persuasive, the Court, sitting as factfinder, could conclude that Watkins' persistent verbal and written reports relating to McClung placed Lincare in a position where they could no longer turn a blind eye to potential Overbilling, and in turn, that as a result of Watkins' reporting, Lincare was forced to repay nearly half a million dollars to the government.

In sum, the question of whether Watkins was discharged for retaliatory reasons "is replete with disputed issues of material fact which must be resolved by the fact-finder." *Taylor*, 788 S.E.2d at 307. As such, Watkins is entitled to present her WVPSA claim at trial.

## B. Count II: Common Law Retaliatory Discharge

In Count II of the Amended Complaint, Watkins asserts that her termination also constitutes a wrongful discharge in violation of a substantial public policy. These common law retaliatory discharge claims are often eponymously called "*Harless*" claims. *See Harless v. First Nat'l Bank*, 246 S.E.2d 270 (W. Va. 1978).

To prevail on a *Harless* claim for retaliatory discharge, Plaintiff must show by a preponderance of the evidence the following four elements:

> (1) That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);
> (2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);
> (3) That plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* elements);
> (4) The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins v. Lowe's Home Ctrs.*, No. 3:17-1902, 2017 WL 6061980, at *3 (S.D.W. Va. Dec. 7, 2017) (quoting *Herbert J. Thomas Mem'l Hosp. Ass'n v. Nutter*, 795 S.E.2d 530, 541 (W. Va. 2016)).

Watkins' *Harless* claim is based upon the public policy set forth in the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. Am. Compl. ¶¶ 68–78. The public policy in the False Claims Act is to empower federal government to monitor, police, and pursue claims against those people and entities who "present or cause[] to be presented, a false or fraudulent claim for payments or approval [to the federal government]. . . ." 31 U.S.C. § 3729.

Lincare posits that Watkins' *Harless* claim must fail for three reasons: (1) the *Harless* claim is superseded by Watkins' WVPSA claim; (2) Watkins has failed to produce a dispute of material fact regarding the causation element; and (3) Watkins has failed to produce a dispute of material fact regarding the overriding justification element. Once again, the Court is not persuaded by any of these arguments.

The Court recognizes that generally a *Harless* claim cannot stand when there is a state statute settling forth a remedy for the public policy at issue and the same facts underlie both claims. *See Adkins v. Cellco P'ship, Inc.,* No. CV 3:17-2772, 2017 WL 2961377, at *4 (S.D.W. Va. July 11, 2017) ("The purpose of the Harless-based claim was to prevent the termination of employees when such termination contravened public policy, specifically when no other private cause of action could enforce the public policy at issue."); *Hawley v. Hospice of Huntington, Inc.*, No. CV 3:19-0759, 2021 WL 517049 (S.D.W. Va. Feb. 11, 2021); *Griffith v. Chemours Co.*, No. 2:21-CV-00368, 2021 WL 4303391 (S.D.W. Va. Sept. 21, 2021); *Daniel v. Raleigh Gen. Hosp. LLC*, No. 5:17-CV-03986, 2018 WL 3650248 (S.D.W. Va. Aug. 1, 2018). And, in this case, the Court agrees with Lincare that *if* the WVPSA applies to Watkins, the Act's anti-waste provision—which protects certain individuals who make claims of abuse, misuse, or loss of funds belonging to any

federal program—would likely supplant a *Harless* claim based on the substantial policy set forth in the False Claims Act.

However, unlike the WVPSA, which applies only to "health care workers," the FCA applies to "citizens." Thus, inasmuch as Lincare has reserved its right to contest that the WVPSA does not apply to Watkins because she is not a "health care worker" as defined by the Act,[19] it cannot assert that the broader *Harless* claim is superseded. Should the Court find at trial that Watkins was not a health care worker, the *Harless* claim would most certainly not be covered by the anti-waste provision of the WVPSA. *See, e.g.*, *Williamson v. Greene*, 490 S.E.2d 23, 33 (W. Va. 1997) (holding plaintiff could maintain a *Harless* public policy claim where West Virginia Human Rights Act claim failed to provide a remedy because the defendant was not an "employer" under the Act).[20] Consequently, the Court is unable to outright dismiss the *Harless* claim.

As to Lincare's remaining arguments for summary judgment on Count II, Watkins has produced sufficient evidence to create a dispute of material fact regarding the causation and overriding justification elements. *See supra* § III(A). Should the Court, sitting as factfinder, find Watkins' evidence credible, it could certainly conclude both that her dismissal was motivated by conduct related to the public policy set forth in the FCA and that Lincare lacked an overriding justification for her termination. Indeed, given Lincare's recent disclosure that it was subject of a FCA *qui tam* and admissions that it engaged in the same type of Overbilling Watkins complained

---

[19] Before the Court, counsel for Lincare was asked whether it intended to challenge Watkins' status as a health care worker. Counsel stated "there certainly would be disputes as to whether she is a health care worker. We haven't fully developed that. I would say with candor, I can't tell you whether we're going to bring it up at trial or not." Hearing Tr. 75, ECF No. 212.

[20] Admittedly, the Court finds Lincare's failure to argue the "health care worker" element of the WVPSA on summary judgment curious, as reserving the issue for trial means the Court must leave Watkins' *Harless* claim alive. Surely the Parties' and the Court's time would have been better spent if all dispositive issues were raised at this juncture.

of up until the very month that Watkins made her first report, it is not unlikely that Lincare was specifically motivated to either (1) quash Watkins' reporting or (2) make her a scapegoat so that the company would not be subject to additional False Claims Act liability. As such, Lincare is not entitled to judgment as a matter of law on Watkins' *Harless* claim.

## C.  Count III: Tort of Outrage

To prove a claim for the tort of intentional infliction of emotional distress or "outrage," a plaintiff must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). To be outrageous, a defendant's conduct cannot simply be "unreasonable, unkind or unfair"—rather, "it must truly offend community notions of acceptable conduct." *Weigle v. Pifer*, 139 F. Supp. 3d 760, 777 (S.D.W. Va. 2015) (quoting *Travis*, 504 S.E.2d at 425).

A wrongful discharge claim, like those asserted by Plaintiff in Counts I and II, differs from a claim for outrage in that the former "depend[] solely on the validity of the employer's motivation or reason for the discharge," while the latter depends on whether "the employee's distress results from the outrageous manner by which the employer effected the discharge." Syl. Pt. 2, *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219 (W. Va. 1994). "Therefore, any other conduct that surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous." *Id.* at Syl. Pt. 2.

Therefore, in order to prevail on an outrage claim based on an employment termination, a plaintiff must prove that the defendant acted outrageously in how it carried out the termination, not simply that its reason for firing her was improper. Moreover, the plaintiff must also show that her distress resulted from "the outrageous manner" by which the defendant terminated her employment. *Id.* Distress resulting from the termination itself does not support the outrage claim. *Id.*; *compare Hosaflook v. Consolidation Coal Co.*, 497 S.E.2d 174, 185 (W. Va. 1997) *with Roth v. DeFeliceCare, Inc.*, 700 S.E.2d 183 (W. Va. 2010).

Lincare argues that it is entitled to summary judgment on Count III because Watkins has not produced any facts suggesting that it effectuated the discharge in an atrocious, intolerable, or extreme way. *Def.'s Mem. of Law* 28–29. While the Court agrees, it would be remiss not to note that this case is distinguishable from the run of the mill employment discrimination cases where plaintiffs attempt to assert outrage claims. *See, e.g.*, *Dzinglski*, 445 S.E.2d at 225–27; *Hosaflook*, 497 S.E.2d at 185. In those cases, the outrage claims are essentially duplicative of their statutory wrongful discharge claims, and those plaintiffs fail to plead and/or prove additional facts regarding the employer's conduct.

Watkins' outrage claim does not fit neatly into that box. Instead, she posits that Lincare's pre- and post-termination acts support the claim. To wit, she argues that Lincare (1) fabricated an investigation by the WVBRC as an excuse to fire Watkins, (2) lied to her about the reason she was being terminated, and (3) sent a letter to a federal agency where knowingly made her the scapegoat for its own unacceptable conduct.

Nonetheless, the Court finds that Watkins has failed to produce sufficient evidence that Lincare's actions were outrageous. While the Court would not hesitate to classify Lincare's

statements to the OIG as false in nature, such conduct better falls within the confines of a civil action for defamation or false light, neither of which have been pursued by Watkins to date.

Although "there is no bright line separating conduct that may reasonably considered outrageous from conduct that may not, conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct." *Jones v. Martin Transp., Inc.*, No. CV 3:19-0373, 2020 WL 1802934, at *7 (S.D.W. Va. Apr. 8, 2020) (cleaned up) (quoting *Courtney v. Courtney*, 413 S.E.2d 418, 423–24 (W. Va. 1991)). Absent a showing that Lincare acted with intent to harm Watkins, rather than merely in an attempt to coverup its own wrongful conduct, or that it otherwise acted outrageously in the effectuation of her termination, this case does not present the level of intolerable conduct required to maintain a claim for outrage. Consequently, Watkins' claim in Count III of the Amended Complaint must be dismissed.

## IV. CONCLUSION

In light of the foregoing, Defendant Lincare Inc.'s Motion for Summary Judgment (ECF No. 188) is **DENIED in part and GRANTED in part.** The motion is granted to the extent that Watkins' Outrage claim in Count III is dismissed; the motion is otherwise denied.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        April 26, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE