IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

JILLIAN WATKINS,

    Plaintiff,

v.                                                                        CIVIL ACTION NO.:  3:22-cv-0109
                                                                       JUDGE: Honorable Robert C. Chambers

LINCARE INC.,

    Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE DOCUMENTS AND TESTIMONY RELATING TO THE SOUTHERN DISTRICT OF NEW YORK INVESTIGATION AND SETTLEMENT**

       Now comes Plaintiff, by and through counsel, to file her Response in Opposition to Defendant Lincare Inc.'s ("Lincare") *Motion in Limine to Exclude Documents and Testimony Relating to the Southern District of New York Investigation and Settlement*.  (The Complaints and Settlement Stipulation are referred to herein as the "S.D.N.Y. *Qui Tam* Documents").  Defendant's Motion should be denied because the S.D.N.Y. *Qui Tam* Documents show, among other things, Lincare's motive, intent, knowledge, and lack of mistake.   In other words, the documents at issue show that the ongoing federal investigation into identical misconduct provided Lincare motive to fire Ms. Watkins for the conduct she had repeatedly reported and then use her as a scapegoat to the Office of Inspector General.  Not only is the evidence admissible, but it also strongly supports a finding of pretext.

## BACKGROUND

       By February 6, 2024, the parties had fully briefed and argued Defendant Lincare's Summary Judgment Motion.  On February 15, 2024, Defendant Lincare produced in discovery two *Qui Tam* Complaints filed against it in the Southern District of New York.  (Ex. A to Sur-

1

Reply in Opp. To Summ. Judg., Relators' Complaint; Ex. B to Sur-Reply in Opp. To Summ. Judg., U.S. Attorney Complaint).[1] The original *Qui Tam* Complaint, filed under seal by Relators on January 29, 2018, alleges:

> Lincare knowingly submitted false claims for payment to Federal health care programs for [Non-Invasive Ventilator ("NIV)] rentals: (a) when the NIVs were not medically necessary or reasonable due to the lack of continued use or continued need [and] (b) when Lincare did not maintain sufficient documentation to show (or otherwise verify) continued use or continued need . . . .

(Ex. A, 1, ¶ 3).

In support of this claim of fraud, the Relators alleged:

*Lincare's Efforts to Increase NIV Rentals to Increase Profits*

- NIVs (the devices also at issue in the *Watkins* matter) are considerably more expensive than CPAPs and BiPAPs. To qualify for the more expensive machines, a patient's condition must be so "severe and life-threatening" that "interruption or failure of respiratory support leads to death." (*Id.* at 13, ¶ 28). Lincare's own internal documents identified an NIV requirement as "Interruption of ventilatory support could lead to serious harm or death," as required verbiage in patients' NIV charts. (*Id.* at 13, ¶ 28).

- Federal programs require that, as a condition of payment, patients must be "compliant" with NIV therapy. (*Id.* at p. 15, ¶ 32). To be compliant, patients must use NIVs for "at least 4 hours per day."

- Because Lincare could bill considerably more for NIVs and it had reason to believe that federal programs would more closely scrutinize new NIV patients in the near future, Lincare "employed a scheme to increase sales and rentals of NIV machines." (*Id.* at p. 16, ¶ 40). As a part of that scheme:

    o Lincare created a sales culture that prioritized NIV sales (*Id.* at p. 17, ¶ 41);

    o Lincare prefilled prescription forms for doctor's signatures with diagnosis codes and machine settings so that only a physician's signature was required (*Id.* at p. 19, ¶ 49);

    o Lincare set monthly NIV sales goals and even awarded trips to Orlando, Florida (*Id.* at p. 20, ¶¶ 54, 57); and

---

[1] Citations to the attachments to Ms. Watkins Sur-Reply in Support of Summary Judgment can be found attached to the Sur-Reply at Docket No. 220.

- o   Lincare bonused employees for "leads" that result in NIV sales (*Id.* at p. 21, ¶ 58).

*Lincare's Scheme to Continue Billing for Unused NIVs*

- Lincare had access to at least two brands of NIVs to rent to patients—Respironics Trilogy machines and ResMed Astral NIV machines.  The newer Astral models allowed physicians to remotely monitor patients' usage while the older Trilogy models required physical downloads of data from the machines and did not permit remote monitoring by physicians. (*Id.* at p. 23, ¶ 65).

- Lincare pushed the older Trilogy machines to avoid a record of non-compliance.  Lincare would only extract the data from the Trilogy machines when a doctor independently sent a separate instruction for Lincare to do so and requested the data.  (*Id.* at p. 23, ¶ 65).

- Because actual data was rarely extracted from the Trilogy machines, Lincare relied on Respiratory Therapists' ("RTs'') observations during patient visits to conduct "vent checks." (*Id.* at p. 24, ¶ 67).

- Even when vent checks revealed non-compliance, Lincare "severely discouraged" pickup of the machines.  (*Id.* at p. 25, ¶ 71).

- With this system in place, Lincare knowingly continued to bill federal programs for reimbursement for patients Lincare knew to be non-compliant with their NIV therapy.  (*Id.* at p. 26, ¶¶ 75).

The United States Attorney's Office for the Southern District of New York intervened and filed a *Qui Tam* Complaint under seal.  (Ex. B).  In the U.S. Attorney's Complaint, it alleges:

- Lincare's primary method of monitoring patient use of NIVs was to have RTs conduct home visits to perform "vent checks."  As part of the vent checks, RTs were supposed to record vent usage to ensure compliance with doctors' orders (*Id.* at p. 2, ¶ 6).

- Lincare's policy required vent checks to occur at least every 60 days.  However, Lincare's RTs failed to comply with this policy "tens of thousands of times," and when RTs did conduct vent checks, they often failed to record how many hours patients used their NIVs. (*Id.*).

- "[I]n some instances, Lincare continued to seek monthly payments from Federal health care programs when it was aware, through home visits and vent checks conducted by its RTs, that beneficiaries had stopped using their devices.  Lincare billed for NIVs on instances when the beneficiary had not used or had very rarely used the devices for over a year." (*Id.* at p. 3, ¶ 7).

3

In February 2024, Lincare entered a Settlement Stipulation with the United States Office of Inspector General ("OIG"). (Ex. C to Sur-Reply in Opp. To Summ. Judg., Settlement Stipulation). Through the Settlement Stipulation, Lincare agreed to repay more than $25 million for, among other things, continuing to seek monthly payments from federal healthcare programs when it was aware that patients were not using the devices. Through the Settlement Stipulation, Lincare ***"admit[ted], acknowledge[d], and accept[ed] responsibility"*** for the following misconduct:

- Lincare is a DME supplier and operates approximately 700 local Lincare-operated locations, known as Centers, throughout the United States.

- In 2015, Lincare targeted growth of its NIV business as a strategic imperative on account of, among other things, technological improvements with NIVs and expected reimbursement cuts by Medicare that would affect Lincare's other business lines. During the Covered Period, the number of patients who rented Lincare's NIVs increased substantially.

- Lincare, through its local Centers, leased NIVs to a substantial number of patients covered by Federal health care programs pursuant to prescriptions written by physicians and submitted claims to those programs to obtain reimbursement for those NIV rentals. In Lincare's marketing to physicians, Lincare asserted that its clinical programs endeavored to offer clinical support to patients at least every sixty days through home visits to support patient progress and to ensure compliance with the physicians' prescriptions. Such prescriptions generally identify periods of the day the patients should use the NIVs, often noting that the patient should use the NIV while she or he slept at night.

- Federal health care programs maintain billing requirements for DME rental items like NIVs. Those requirements provide, as applicable here, that NIV rentals must be reasonable and medically necessary. In addition, DME suppliers like Lincare are not permitted to offer coinsurance payment waivers where one purpose of the waiver is to induce NIV orders or referrals. Lincare understood that claims submitted to Federal health care programs seeking reimbursement for NIV rentals must comply with these requirements.

<u>Failure to Ensure All NIV Rentals Were Reasonable and Medically Necessary</u>

- Lincare knew that patients needed to use their NIVs to receive the benefits of NIV therapy. Lincare also knew that it was responsible for monitoring the utilization of NIVs and that Federal healthcare programs require providers to discontinue billing when rental items are no longer medically necessary and are no longer being used by beneficiaries.

- Lincare relied on Center clinical staff as well as outreach through its clinical programs to monitor patients' usage of their NIVs. According to Lincare's internal protocols for its Centers, clinical staff were expected to regularly follow up with NIV patients-including through home visits at least every sixty days to ensure patient progress and compliance with physicians' orders.

- In violation of Lincare's internal protocols, Lincare's Center clinical staff frequently failed to visit NIV patients every sixty days to confirm that the patients were using their NIVs as directed by their physicians. Some Centers lacked sufficient staff to adequately monitor patient progress and confirm that patients were using the devices as directed by their physicians. On many occasions, clinical staff did not perform home visits for NIV patients for several months.

- In addition to conducting patient visits, Lincare had the ability to remotely monitor certain patients' NIV usage for certain newer NIV models through online cloud-based platforms. However, Lincare did not use these systems to confirm that those patients were using the devices as directed.

- Lincare continued to seek monthly payments from Federal health care programs for NIV rentals in many instances when its staff had not verified that patients were still using their NIVs, or had not maintained documentation showing that the patient continued to use the devices.

- In some instances, Lincare continued to seek monthly payments from Federal health care programs when it was aware that patients were not using the devices.

- In addition, certain of Lincare's internal audits, including a 2018 internal audit, indicated that certain beneficiaries were not regularly using their NIVs.

Coinsurance Payment Waivers

- Lincare offered coinsurance payment waivers to certain patients, including NIV patients with Medicare and TRICARE coverage.

- Lincare's policy required documentation of financial hardship and prohibited waiving coinsurance payment for Medicare and Tricare beneficiaries for reasons that were unrelated to the patient's financial ability to make the payment.

- During the Covered Period, on certain occasions Lincare granted coinsurance payment waivers that were not based on the patient's financial need in order to persuade patients to rent NIVs.

\*   \*   \*

- As a result of the above-referenced conduct, Lincare received reimbursements from the

    Federal health care programs for some NIV rental claims that did not comply with all of those programs' billing rules and guidance.

(*Id.* at p. 3-4).

  The "Covered Period" during which the United States alleges that "Lincare violated the [False Claims Act] by knowingly submitting false claims to Federal Health care programs for NIV rentals" is from <u>January 1, 2013, to February 29, 2020</u>. (*Id.* at p. 2). The Covered Conduct includes, *inter alia*, "when the NIVs were not medically necessary or reasonable due to the lack of continued use or continued need" and (2) "when Lincare did not maintain sufficient documentation to show (or otherwise verify) continued use or continued need." (*Id.* at p. 2). Subject to the Settlement Stipulation, the federal government released Lincare from civil and monetary claims under the FCA for the Covered Conduct during the Covered Period. However, the Settlement Agreement did not release Lincare for false billing for NIVs following February 29, 2020.

## ARGUMENT

  Lincare asserts that the S.D.N.Y. *Qui Tam* Documents are inadmissible because they are irrelevant, unfairly prejudicial, and could be used as improper character evidence. For the reasons set forth below, Lincare's contentions are without merit, and the S.D.N.Y. *Qui Tam* Documents are admissible.

1. **Given that the *Qui Tam* Investigation Was Ongoing (i) When Ms. Watkins Was Making Her Reports, (ii) When Lincare Fired Her, and (iii) When Lincare Blamed Her for the False Billing in a Letter to the OIG, the S.D.N.Y. *Qui Tam* Documents are Highly Relevant and Admissible Under Rule 408.**

  In a single sentence without any legal citation, Lincare claims that the S.D.N.Y. *Qui Tam* Settlement Stipulation is inadmissible under Rule 408. However, as this Court has already found,

"Rule 408 does not preclude the admission of settlement agreements for the purpose of showing defendant's knowledge and intent."[2]  (Summ. Judg. Order, p. 12) (Docket No. 224).

Rule 408 of the Federal Rules of Evidence gives the Court broad discretion in determining whether the Settlement Stipulation, including the conduct that was admitted by Lincare, is admissible.  Rule 408 states:

> (a) Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
>> (1) Furnishing, promising, or offering—or accepting, or promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim;
>>
>> (2) Conduct or a statement made during compromise negotiations about the claims—except when offered in a criminal case and when the negotiations relating to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> (b) The court may admit this evidence ***for another purpose***, such as proving a witness's bias or prejudice, negating a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis added).

Courts have repeatedly interpreted Rule 408's "for another purpose" language to permit the use of facts in settlement agreements or negotiations to prove, among other things, that a Defendant (1) was on notice of its unlawfully condoned conduct; (2) knew that its conduct was unlawful; (3) maintained a pattern or practice of unlawful conduct; (4) had knowledge of its legal obligations; or (5) for any other purpose that would be contrary the public interest outlined in Rule 408.  *See generally  Spell v. McDaniel,* 824 F.2d 1380, 1440 (4th Cir. 1987) (Finding no error when district court admitted evidence of prior settlement to prove notice of an unlawfully

---

[2] The S.D.N.Y. Complaints likewise can be used to put Lincare on notice of the federal investigation into similar wrongdoing by Lincare.

condoned custom); *Ray Commc'ns, Inc., v. Clear Channel Commc'ns, Inc.,* 673 F.3d 294, 306 (4th Cir. 2012) (Facts relating to settlement agreement do not fall under Rule 408 that are public and discoverable); *City of Huntington v. Amerisourcebergen Drug Corp.,* Civil Action No. 3:17-01362 (S.D.W. Va. Apr. 29, 2021) (Denying motion in limine to exclude settlement agreements under any of the Rule 408 exclusions because they may be used to show knowledge of the Defendant, intentional misconduct by the Defendant, and a pattern of misconduct); *Bituminous Const., Inc. v. Rucker Enterprises,* 816 F.2d 965 (4th Cir. 1987) (Upholding a district court's decision to admit settlement offers to show knowledge of legal obligations); *Sky Med. Supply Inc. v. SCS Support Claim Servs. Inc,* CV-12-6383, at *10 (E.D.N.Y. Mar. 24, 2017) (Granting in part subpoena for settlement agreement because it "may 'establish a fraudulent scheme' . . . or contain, and admission of such a scheme or any admission of fact . . . ."); *Barnes v. District of Columbia,* 924 F. Supp.2d 74, 90 (D.D.C. 2013) (Denying motion in limine to exclude the use of settlement agreement in prior matter because it may be used to show "deliberate indifference" of legal obligations); *Larson Mfg. Co. of S.D., Inc. v. Conn Greenstar, Inc.,* 929 F. Supp.2d. 924, 933 (D.S.D. 2013) (recognizing exception to Rule 408 when the settlement could protect fraud and deception as it would not advance parties' confidence in the settlement process); *Southwest Nurseries, LLC v. Floristis Mut. Ins., Inc.,* 266 F. Supp.2d 1253, 1257 (D. Colo. 2003) ("Rule 408 does not impose an absolute ban on the admission of statements made during settlement negotiations. For example, evidence of settlement offers may be admissible . . . to provide the defendant's knowledge and intent[.]"); *Miko v. Commission on Human Rights & Opportunities,* 220 Conn. 192, 209 (Conn. 1991) ("One exception to [Rule 408] is that a statement made during settlement negotiations *may come in as an admission of fact,* where the statement was intended to state a fact."); *CE Services, Inc. v. Ashland Inc.*, 539 F. Supp.2d 316, 319 (D.D.C. 2008) (Denying

motion to exclude settlement agreement between the United States and Defendants with admissions relating to a False Claims Act investigation because the same could be used for "other purposes" under Rule 408, such as establishing knowingly false representations); *see also* Fed. R. Civ. P. 404(b) (Other crimes, wrongs, or acts may be admissible to show proof of *motive*, plan, knowledge, or absence of mistake or accident).

In this case, and as articulated at length in Plaintiff's Sur-Reply in Opposition to Summary Judgment (Docket No. 220),[3] the S.D.N.Y. *Qui Tam* Documents can properly be used under Rule 408 to show, among other things, motive, knowledge, intent, and lack of mistake. For instance, Lincare's knowledge of an ongoing federal *qui tam* investigation into identical misconduct would provide a possible motive for Lincare to fire a lower-level employee (Ms. Watkins) and then use her as a scapegoat with the OIG. Lincare's knowledge of the ongoing federal investigation also provided a possible motive for Lincare to disavow higher-level supervisor culpability for the false billing out of the Huntington Center by firing and blaming Ms. Watkins for the same issues that she had repeatedly reported to Human Resources. Additionally, Lincare had a financial motive to terminate Ms. Watkins and blame her for the misconduct thereby avoiding having statutory False Claims Act penalties for each false billing "voluntarily" reported to the OIG. In other words, Lincare only paid the amount of the federal government's losses and not the False Claims Act statutory penalty of up to $11,000 per false billing event. For all of these reasons, and the reasons set forth in Ms. Watkins' Motion to File Sur-Reply and Sur-Reply, the S.D.N.Y. *Qui Tam* Documents are highly relevant, and Rule 408 does not bar the admission of the documents.

---

[3] Plaintiff adopts herein her arguments on this same issue in prior briefing in this case, including the argument that the admissions in the Settlement Stipulation are admissible.

2. **The S.D.N.Y. *Qui Tam* Documents are Prejudicial, but not Unfairly Prejudicial.**

Lincare also contends that any reference to the S.D.N.Y. *Qui Tam* Documents would be unfairly prejudicial to it under Rule 403. All relevant evidence is prejudicial. *See Mullen v. Princess Anne Volunteer Fire, Inc.,* 853 F.2d 1130 (4th Cir. 1988) ("All relevant evidence is 'prejudicial' in the sense that it may prejudice the party against who it is admitted."). While evidence of a federal investigation into the same subject matter at the same time as the events at issue in this case is prejudicial, it is not unfair prejudice. Furthermore, there is no risk of unfair prejudice in a bench trial. This Court, as the trier of fact, is well-versed in the Federal Rules of Evidence. Therefore, there is no risk of unfair prejudice.

3. **There is No Risk of the Court Recharacterizing this Evidence as Impermissible Rule 404(b) Character Evidence.**

Without any legal support, Lincare contends:

> SDNY Settlement is also not admissible as evidence of Lincare's character to prove that on that occasion, Lincare acted in accordance with that character or trait. There is a high risk that should this evidence be presented at trial, that it would be used for such an improper purpose.

(Motion, p. 3). Ms. Watkins has identified several permissible bases for the use of the S.D.N.Y. *Qui Tam* Documents. Because the Court is the trier of fact, there is no risk that this highly relevant evidence will be considered for impermissible purposes.

## CONCLUSION

For the reasons stated above, the Court should deny Lincare's *Motion in Limine.*

                                            **JILLIAN WATKINS,**
                                            **By Counsel,**

  */s/ Rodney A. Smith*
Rodney A. Smith (WVSB # 9750)
M. Alex Urban (WVSB # 13480)
108 ½ Capitol Street, Suite 300
Charleston, WV 25301
(T): 304-342-0550
(F): 304-344-5529
rod@LawWV.com
aurban@ LawWV.com

Guy R. Bucci (WVSB # 521)
Ashley N. Lynch (WVSB # 11714)
108 ½ Capitol Street, Suite 200
Charleston, WV 25301
(T): 304-550-5660
guy.bucci@outlook.com
ashleynlynch@outlook.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**JILLIAN WATKINS,**

    **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　**CIVIL ACTION NO.: 3:22-cv-0109**
　　　　　　　　　　　　　　　　　　　　　**JUDGE: Honorable Robert C. Chambers**

**LINCARE INC.,**

    **Defendant.**

### CERTIFICATE OF SERVICE

The undersigned, counsel of record for Plaintiff, Jillian Watkins, does hereby certify that on this 17th day of May 2024, that a true copy of the foregoing *Plaintiff's Response to Defendant's Motion in Limine to Exclude Documents and Testimony Relating to the Southern District of New York Investigation and Settlement* was served upon the defendant through the Court's Electronic Case Filing (ECF) system to the following:

    Vivian H. Basdekis
    Blake N. Humphrey
    FROST BROWN TODD LLP
    vbasdekis@fbtlaw.com
    bhumphrey@fbtlaw.com

    Lawrence M. Kraus
    Lea Gulotta James
    FOLEY & LARDNER LLP
    LKraus@foley.com
    ljames@foley.com

    *Counsel for Defendant*

 */s/ Rodney A. Smith*
Rodney A. Smith (WVSB # 9750)
M. Alex Urban (WVSB # 13480)
108 ½ Capitol Street, Suite 300
Charleston, WV 25301
(T): 304-342-0550
(F): 304-344-5529
rod@LawWV.com
aurban@ LawWV.com


Guy R. Bucci (WVSB # 521)
Ashley N. Lynch (WVSB # 11714)
108 ½ Capitol Street, Suite 200
Charleston, WV 25301
(T): 304-550-5660
guy.bucci@outlook.com
ashleynlynch@outlook.com